Let's go to the second case, Davis v. White. Let's let the courtroom settle a little bit before you come to the podium. I'm sorry? We're going to let the courtroom settle before you come to the podium. Oh, I'm sorry. Just make sure everyone's in their place. Thank you. Okay, Mr. Pino. Good morning, Your Honors. Good morning. Jim Pino here for the appellates who are the defendants below. As Your Honors understand, this is three cases that were consolidated for trial and on appeal. Multiple issues. I'm going to try to hit them as quickly as I can with my time limits here. First, I want to address the 1983 cases. I think this is probably the most straightforward issue in this case. There were three sets of plaintiffs, one of which, the Sloans, their 1983 claim was the jury filed against them. We're only here for two cases, the Davis's and the Lawrence's. Both cases resulted in nominal damages of $1 and punitive damages of $375,000 to the Davis's and $450,000 in punitive damages for the Lawrence's. This case basically, judges, is a billing dispute between a private sewer company, which is family-owned business, and three sets of customers. It is somehow morphed into a runaway train resulting in approximately $4.5 million in verdicts and 4.2 of which are all punitive damages. In fact, the only case that resulted in any compensatory damages was the Outrage case, which should never have been allowed to go to the jury, which I'll get to later. But I think there was no state action. Well, I mean, it looked like the record showed that there was some pretty outrageous conduct on the part of your client in depriving some people of water. And so it's not entirely surprising that when you, through some pretty egregious conduct, deprive people of something fundamental to life, that something that looks like a billing dispute could morph into something far more. So what issue do you want to talk about? Well, the optics of that were bad. I concede that. But the point is, as far as the 1983 cases, the Lawrences, excuse me, the Davises, never lost their water service. So, I mean, they never lost it at all. To get back to the Chief's question, you have a lot of issues on the 1983 claims. Yes. Which one do you want to focus on? Because you raise a challenge to the sufficiency of the evidence on whether or not there's state action for 1983 purposes. Right. You challenge the size of the punitive damages verdicts, et cetera, et cetera. So which one do you want to take us on first? Let's talk about some law this morning. Okay. Let's talk about, as far as the punitive damages claim on the outrage case. It's our position, Judge, that Judge Cougar created out of whole cloth a claim under outrage, which has not been ever recognized by the Alabama courts. There are only basically three. It's a very limited tort. There are only three types of cases that have been recognized. One involves sexual, egregious sexual harassment, barbaric practices in collecting insurance premiums. Why isn't this close to that second category? I mean, the common law develops. Outrage is a common law tort in Alabama, right? Yes. It was created by the court. Right. So it's a common law tort, and courts acting in a common law fashion are sometimes able to shift the law and move the law to situations that hadn't otherwise existed first. Why isn't this close enough to the unconscionable collection of insurance premiums? This is the collection of allegedly unpaid water bills, plus penalties, plus interest, plus liens placed on the homes, etc., etc. Why isn't that close enough? Well, first of all, the issue, the threshold issue on that is should federal courts be creating a new cause of action that doesn't, hasn't been recognized by the Alabama, since this is a creature of state court. Your position is that a federal court, I mean, and you're right that there should be some hesitation on the part of a federal. You're saying federal courts are prohibited from doing that on a state diversity thing? I think in this case it was a stretch to expand the scope of the tort of outrage to include these billing issues and water. Just answer the question that Judge Jordan posed to you, because it's a question I have too, which is why isn't this on the outrage issue analogous to what the Alabama Supreme Court has recognized in the insurance context? Well, first of all, there's been no physical injury. Number two, there has been no, there was no testimony except, I believe one of the plaintiffs, one plaintiff testified that he was upset about the fact that the bill had, the billing had piled up and he was unable to pay. But there's been no physical injury, and it just doesn't have, it just doesn't have the same. Was there a physical injury in the insurance case? I'm just blanking on that. I thought it was that the insurance company was using incredibly aggressive tactics to get an insurer to settle. I'm not sure, frankly, whether there was any physical injury in that at all. But under the general rule of punitive damages, that's for reprehensibility, that is one of the criteria is whether or not there's been any physical injury. We have, in fact, of all the criteria for reprehensibility, we have profitability, which is not an issue. What do you mean profitability is not an issue in your case? Your clients were trying to, as the jury found, so we're viewing the evidence in the light most favorable to the jury verdicts. Your clients were basically trying to extort homeowners with threats of liens, excessive fees, and things that were just made up, like the cutting of the locks, the addition of interest, the refusal to accept partial payments for the monthly use of the utilities. You don't think that's reprehensible? I think it's bad conduct, but I don't think it rises to the level of these, to the definition of what an outrage is, is whether it's so barbaric that it cannot be tolerated by a civilized society. I don't think it rises to that. Could he take those water off? Well, if you, for not payment. I mean, you're honest. If you don't pay them. Without any kind of notice? Well, that was not the case in this. There's undisputed that each of these homes received a written 10-day notice of termination. They don't have any kind of, there's no kind of hearing, there's no kind of process for them to show that you're wrong, that your client was wrong. Well, they have an informal process where they, in fact, did do that. In the Davis's case, when they discovered that the water, when they called the company about the water being turned off, it was discovered that their water was already on. So they never lost any water at all. And as far as the Davis's are concerned, I mean, the Lawrence's, their water was out for a total of between three and five hours. I mean, that's- But it's not just the water being out. It's, again, looking at the evidence in the light most favorable to the jury verdicts, a lot of what your clients were demanding be paid were bogus fees, right? They were, I'm sorry, they were- Bogus. Bogus. Bogus. Well- Viewing, I know there was a defense that they weren't, but there were some things in there that the jury obviously believed were not legitimate fees. This is not a case of a water system or a utility system telling somebody, you've had three months of unpaid bills, and if you don't pay by the fourth month, we're going to cut off. Here are your monthly things. You're in arrears. You have to pay. This was- You tacked a lot of stuff on that a jury found was not legitimate. So that adds to the- Looking at it as an appellate judge and trying to give some respect to the jury findings, this is not just a dispute over billing. Well- If you're talking about reprehensibility, it's not that. It certainly doesn't warrant $4.2 million in punitive damages. But like in your view- Why legally does it not warrant that? And that's a total sum. So you're saying that the total sum is violative of some legal principle or- The totality of the punitive damages in this case, these three cases, loses all proportionality to the harm done, because the harm done on all the cases except the outrage case was $1 in nominal damages. And then yet you have, in one case, $665,000 in punitive damages and $1 in nominal damages. I mean, that loses all proportionality and I think is unconstitutional. I see my time is up. Thank you. Thank you. Okay, Mr. Ritchie. Good morning, Your Honors. My name is Scott Ritchie and I'm here on behalf of the appellees. One thing I wanted to hit on first is the proportionality that Mr. Pinot was just talking about, comparing the nominal damages to the punitive damages. And although this court and nor the Supreme Court has ruled on the comparison between nominal damages and punitive damages, other sister circuits have done so, and generally they'll exclude that part of the test under B&W Gore from consideration when there are just nominal damages involved. As far as the damages from outrage- How should we look at that? Should we think of this as- I'm not entirely sure that we can say the State Farm and B&W decisions have no application in this context, but we need to look at what the intended harm was, for example, as opposed to the problem that ordinarily you would have is you prove compensatory damages. There was actual harm, but in the event that the defendant got away with it, so to speak, but intended a harm that would have resulted in a compensatory damages award, had it been successful of a certain amount, that we would look at the ratio in those terms? Have any courts kind of articulated what we're supposed to do here? Yes, Your Honor. I'm not saying we don't look at B&W or State Farm, but as far as the proportionality part of it, that specific test under those cases, that's something that's been disregarded. Now, as far as finding some relationship, we can look at the reprehensibility or the actual or potential harm that has been committed on the plaintiffs here. And that's what this court and Supreme Court has also done, is look to that potential harm or actual harm that has actually occurred. In the lower court, the district court found that the actual sewer fees, which combined were just around $500,000, was the actual harm that these plaintiffs had, which that was not challenged by the appellants in this case, that actual harm. Now, when we look to that ratio, they're all single-digit multipliers, which is generally found to be constitutional.  The jury didn't make any finding like that? So in terms of what this actual harm was, doesn't it have to be based on something that the jury was grappling with or no? No courts have said it actually has to be what the jury looks at. It doesn't say the actual harm has to be compensatory damages. It just looks at what it could be or what the intended harm or potential harm was. No court that has— What did the district court instruct the jury on with regards to the measure of punitives? I don't believe they instructed anything on how to measure punitives. I just think they said that it could be awarded in these cases. There was no—I haven't taken a look at the record. This is a big record, and I haven't looked at it yet. But there was no instruction to the jury on how to calculate punitive damages and what the substantive standard is? Not as far as the actual calculations. Not saying if you find $100,000 in punitive, you have to find it three times. They said it's some way to punish defendants if their acts have been sufficiently reprehensible. Let me suggest something to you, Mr. Ritchie. State Farm says in the guidepost that one of the things that we look at is the disparity between the actual or potential harm that the plaintiff suffered in the award of punitive damages. If I look at this record, the jury didn't find that there was actual harm. Nominal damages awards. What was the potential harm that this record would support? Sure. The potential harm was foreclosure of these houses. Potential harm was having all these liens. Money. Money. Tell me numbers. How would I calculate what the potential harm was to evaluate a ratio for punitive damages? Right. What the district court did was look at the actual sewer bills that were claimed by the defendants all over in excess of $100,000. That's what the district court used to compare in their judgment. Assuming that the entire amount of those bills was bogus? Right, Your Honor. Are you telling me that's right, that the record supports that, that the entire amount of whatever the $100,000 was, was in fact bogus? Was in fact bogus? I believe there were actual monthly charges on there that a plaintiff would have had. That are legitimate, right? That are legitimate, right, Your Honor. For one of the couples or one of the families ran into the 90s of dollars a month, right? Right. It's about $92 a month for one of the families. About $92 a month. But the district court's including the $92, something that was in fact a legitimate charge or not? I believe they just included the whole bill as a whole. I don't think anything . . . How is it a harm that if you're actually being given water for which you would owe, say, $92 a month? Well, that's where the partial payments aspect comes into it. Our clients were continuously trying to pay the base fee of that $92 each month, and they're being rejected. I really don't understand that as an answer to my question. I really don't, okay? If we're really talking about harm, okay, we're not talking about the amount they legitimately owe. Your clients legitimately owe. We're talking about something in excess of that. But you're telling me what the district court did in evaluating this ratio was it looked at the amount that was legitimately owed plus bogus fees, right? Right, Your Honor. And part of that's not harm. It strikes me, okay? So if we looked at the part that's actually harmful, and maybe there's more in the record than just that. Right. Tell me, help me with a big record, figure out what that amount is so I can look at, evaluate the ratio. Sure, Your Honor. Do you understand? I believe so, and I'm trying to say that that is just the start of the harm. Now, the other part of the harm we don't have figures on as far as losing water and everything else. But the actual harm of the bogus fees would really be that amount, I don't have it in front of me, but the full amount of those bills minus about $92 per month throughout the course of the litigation, which is what they would have actually owed without the bogus fees. Your best answer is, I'm looking at the district judge's post-trial order on remitter, is that the legitimate fees, the $4,000, to use one of the families as an example, would not have made a difference because the fees demanded were $165,000. You take $4,000 out, you're down to $161,000. The ratio becomes the same, except maybe for a hundredth of a point. Right, Your Honor. So it's kind of negligible what the actual base rate was on that. You're right on that. That's very helpful. Thank you, Judge Jordan. Could you address the government action for the 1983 claim? Yes, Your Honor. This one we've relied on, focused on the family on this case. While just a contract between the government, which in this case would be the GUSC and the private party, which would be the sewer system, does arise to that state actor level, there's a provision in that purchase agreement between Yes, explain. I mean, honestly, I've tried to map out the relationship between these entities. Right. So the private sewer system existed first, and then the city comes in and enters this relationship with the private sewer system? Is that what happens? So the private sewer system becomes existent. This town develops later, and they want to develop a collection system, which actually takes the sewage out of the house, but they need to go somewhere. So the treatment plan, which is owned by a sewer company, is where they want to connect it up to. So there's a purchase agreement that allows CIRMA to take that collection system out and ship it to their treatment plan, which is run by ECO. And so that's where that relationship comes into play. In the purchase agreement, CIRMA is supposed to be collecting all the fees, and if there's uncollected fees, then they would pass it off or offload it to the GUSC, who then would attempt to collect it. Well, that situation comes up where there's about 130,000 of uncollected fees that CIRMA is alleging that the GUSC now owes. CIRMA makes a demand on the GUSC through those emails with the chairperson, Nancy Ray, and she basically says, hold on, you're supposed to exhaust all collection efforts. You haven't done everything in your power to collect on these debts, so you need to go and do that. And not only does she tell them to do that, but they offer police protection for these agents that are going to go and run and do these water cutoffs. And so those collection practices, which included that water cutoff on our clients, is what created the harm. And then focus on the family. It says when a state is contractually required a private party to take particular actions, which in this case would be the collections of these past due bills that they were trying to offload on the GUSC, then this is sufficient for finding the joint nexus test and satisfying the state actor test. So that's where that state actor play comes in, is they're forcing this private party, this private sewer system, to go in, collect these fees first, exhaust all their efforts to collect these fees, and that's what creates this deprivation. Not only that, but there's a wastewater standard out there. I take it that the law about that was explained to the jury, and the jury had to make the findings of fact about it. Is that right? Right, Your Honor. They were explained what that joint nexus test. That was the only test that was actually, that jury was instructed on, was that test. Tell me this. Why isn't the award of the punitive damages on the state tort claims in violation of the statutory cap on punitive damages? It seems to me that these damages are capped at $500,000. Right, and that's per— On each of the state tort claims. Right, Your Honor. That's per plaintiff on there, as what the statute reads. The district court said that not one plaintiff was awarded more than that $500,000 cap. Well, the Sloans received $665,000 for their claim of deprivation of property rights. The Lawrences received $702,000 for their version of that claim. The Davises received $1,000,000 for outrage. Why aren't all of those awards in excess? I believe each plaintiff is allowed the $500,000 cap. It doesn't say each case is capped at that. Right, so the statute says, I've got it in front of me, it says, No award of punitive damages shall exceed three times the commit-story damages of the party claiming punitive damages or $500,000, whichever is greater. So your position is that that of the party claiming punitive damages means— For each plaintiff. So each plaintiff would have that allowable cap on that. It doesn't say the parties or— Aren't these pleaded, though, as single claims? Yes, they're pleaded in the same, you know, same there, but, you know, the statute— I mean, they didn't each—so you're talking about the couples. Right, Your Honor. The married couples didn't assert it as a claim of husband and then a separate claim of wife with separate awards on the verdict form for each. There weren't separate awards on the verdict form for each. They were all combined into one. Yeah, I mean, where would we—I guess the question that I have about this is where would we look to determine— I think you're right, it's the party claiming punitive damages. In this case, how would we determine who is the party? You seem to suggest it's each individual person. But it doesn't seem like it was litigated where it's each individual person individually. Well, I guess it was litigated as each family and then obviously consolidated as a trial. So although it's not, you know, set out on the verdict form which plaintiff in each case got which award of punitive damages, I think they're still allowed 500 each, which combined, you know, would put that together. How is the judgment worded? Do you remember? I believe it's just—I think it says both are awarded, you know, that amount. They're both included in the same. The problem was it was litigated as a single claim, it seems to me. Sure, but I think each of them had— It'd be one thing if each spouse alleged a separate claim for each spouse and it was litigated that way and then you had a verdict form where the verdict comes back and the damages awards are particular to each spouse. It wasn't done that way, right? Right, Your Honor. But I would just say I do think that kind of takes away, you know, although it's a state statute, I think it takes away from, you know, all the green oil and ham cases which kind of contradict having that Richard application. Let me ask you this. I mean, if I look at the complaint, I mean, so I guess there are a couple of different places where you can look to see who the parties are. One is you can look to the judgment, the things that happened at the end of the case. The other is I can look at the beginning of the case. Your complaints all identify the parties separately. You say this, you know, like I'm looking at the Sloan complaint. It says Plaintiff Nicole Sloan is a party. Plaintiff Jonathan Sloan is a party. How much should that matter in determining who the parties are for this punitive damages? Right, and I know you can claim each party was, you know, in the same type of, you know, had the same type of conduct against them, and we did name each party separately. It's not just, you know— I'm sorry, but when you had an outrage claim, for example, did you allege one outrage count for the husband and then a separate outrage count for the wife? No, Your Honor, but we did show where both of them had different, you know, places, you know, different things happen to them and it caused the outrage. And although it was played together, they're not separate counts in those actual complaints. Although I think it would be a pretty strict ruling to say that we can't say or infer that those conducts were had on them separately and each of them were one party to the case. Does a defendant in Alabama pay the plaintiffs jointly and severally? We talk about joint and several liability usually on the defense side, but do they extinguish their— I think it would have to be to both. In what amounts? That's what we're trying to get at. Sure. I understand and— They wouldn't pay $250 to each, right? Or would they? I think that would be okay, you know, in this circumstance. You're happy to take the money, is that what you're saying? I'm happy to take it in this circumstance. I think, I mean, especially where, in this case, most of the actions occurred at the same time and to the same people. I think splitting it down the middle would be quite fair in this point. One, half to the husband, half to the wife in that sense. Okay. I think we understand your case, Mr. Richman. Thank you, Your Honors. Mr. Fino, you've saved five minutes. May it please the Court, on the issue of caps, there are two separate statutes that potentially apply. Yeah, I think you don't have a very good argument on the other one, but the small business one— The small businesses? Yeah. Okay. I can only speak for myself, but the one that's more interesting to me is the— Well, as to the $500,000 cap, the statute says that it applies to each occurrence, $500,000 per occurrence. And the jury verdicts were—the awards were to the plaintiffs collectively, not separately. And I think the district court— Well, it says that— Arbitrarily— Correct me if I'm wrong, 61121A, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or $500,000, whichever is greater. That's what it says, right? Yes, sir. Okay. And that's why we're having this debate about whether the district court was right to say, well, each couple has two parties, right? Given that language, though, does it matter whether the couples were asserting a single outrage claim that resulted in a verdict form that returned a punitive damages award and a lump sum? Right. But it says no award. And respectfully, I believe that no—the award was the total amount, and it was not differentiated between the parties. Was the jury told in the instructions to award punitives if it decided to award punitives to a set of plaintiffs collectively? Yes. Yes. That's the way it went, and that's where the verdict forms went. The award was the $500,000— Then how do you divide? How do you intrinsically divide the award, then? How do you do it? I think you just have to look at it collectively. Okay, but fine. Collectively, the cap is $500,000. Right. So that means if you have a family of three, each one gets what? $160-something thousand? I don't know that you can go through that exercise. I mean, if you have— What do you want us to do, then? I think— I think you just have to consider that half to half and half, because that's the only logical way— So we have to redo the judgment, and now we have to tell the district court to enter a judgment that says, you know, for the Lawrences, you know, Mr. Lawrence gets X amount of punitives, Ms. Lawrence gets X amount of punitives, and like that? I just think you have to look at it collectively. Answer this question for me. I think that this statute is a little tricky because it does say the party claimed punitive damages. That's the cap. The cap applies to the party. The district court just said, look, you just look at the docket sheet, and you look at the parties. And, you know, you look at our docket sheet. It's not the Davises and the Sloans, and, you know, it's each individual person. Why isn't that just the right way to determine who the parties are? I mean, that's one way to look at it, but I just think that it's— Well, why is your way better? Well, Mr. Pino, as I understood, when you started this rebuttal, you came back to the first language, which was no award. It speaks of it in terms of an award, and the award here was greater than that. That's really all you got, isn't it? Well, yes, that's it. And briefly, if I may, on the issue of focus on the family for the state action, that is easily distinguished to this case and based on that decision, which the court found in focus on the family that the state had caused the third-party harm, not the private company. And I think that's easily distinguishable from the case here. There was absolutely no issue, not a scintilla of evidence, of any coercion by the GUSC or the governmental agency in this case. It was all the doings of the private company. Any other questions? Thank you. Thank you, Mr. Pino. I think we understand your case.